## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **JOSEPH E. STEPHENS,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **7:14-CV-01778-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

The claimant filed applications for disability insurance benefits and supplemental security income on December 7, 2010. (R. 24, 147-56). The claimant alleged disability beginning February 1, 2005. (R. 147-56). He later amended his alleged onset date to November 29, 2010. (R. 42, 204). The applications were denied. (R. 73-74). In a decision dated September 21, 2012, the ALJ found that the claimant was not disabled at any time through December 31, 2010, the last date insured, but became disabled on April 12, 2011. (R. 33). The Appeals Council denied the claimant's request for review as to the finding of no disability before April 12, 2011. (R. 1-5). Given the last date insured, that finding meant that the claimant was ineligible for disability insurance benefits. The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES the decision of the Commissioner as to the finding of no disability before April 12, 2011, and REMANDS it for further action consistent with this

decision.

## II. ISSUES PRESENTED

The claimant presents the following issues for review: (1) whether the ALJ failed to properly consider listing 12.05C of the regulations to evaluate the claimant's disability; and (2) whether substantial evidence supports the ALJ's determination of an RFC for the claimant's condition prior to April 12, 2011, as to  (a) the ALJ's analysis of the claimant's hypertensive condition prior to that date, and (b) the ALJ's pain standard analysis.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir.1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational

factors "are not medical opinions...but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?

3

> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.

When the claimant fails to bring the ALJ's attention to a specific listing, the ALJ is under no obligation to specifically discuss whether the claimant's impairments meet or equal a specific listing. *Robinson v. Astrue*, 365 F. App'x 993, 995 (11th Cir. 2010). Furthermore, the ALJ need not scour the medical record searching for other impairments that might be disabling, either individually or in combination, that have not been identified by the claimant. *Street v. Barnhart*, 133 F. App'x 621, 627 (11th Cir. 2005). Moreover, the "administrative law judge is under no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996).

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be

---

[1]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of

disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

If the ALJ decides to discredit the claimant's testimony as to her [subjective symptoms],

she must articulate explicit and adequate reasons for that decision; failure to articulate reasons for

discrediting claimant's testimony requires that the court accept the testimony as true. *Foote v.

Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). A reviewing court will not disturb a clearly

articulated credibility finding with supporting substantial evidence in the record. *Foote*, 67 F.3d

at 1562.

## V. FACTS

*1.  General History*

The claimant was fifty-two years old at the time of the ALJ's decision. (R. 46). He has an

eleventh-grade education with no special education history, and has past work experience as a

seat installer and as a cleaner.  (R. 59).  The claimant originally alleged that he was disabled

because of hypertension, stroke, headache, dizziness, depression, memory loss, and carpal tunnel

syndrome. (R. 185).

The claimant has a history of alcohol abuse, but insists that he stopped drinking in 2004.

(R. 53).  Records from the Indian Rivers Community Mental Health Center reflect that he had a

history of  attending group sessions on topics related to alcoholism and addiction, including

anger and stress management, coping with depression, sexually transmitted diseases, spirituality,

negative effects of alcohol, etc.  (R.  375-409).

In the Function Report the claimant submitted to the Agency dated December 16, 2010,

the daily activities that the claimant described were watching tv; dressing himself, but routinely using a seat during the dressing process; bathing and grooming himself, but using a shower chair to avoid falling; preparing tv dinners in the microwave; making his own bed and cleaning his room but doing the process slowly in a one-two hour period; shopping for food twice a month; riding in a car two or three times per week with someone else driving. As to sleeping, the claimant stated that he did not go to sleep until 2-3 AM and awoke at about 5 AM. The Report asked "Have you ever been fired or laid off from a job because of problems getting along with people?" The claimant responded yes, that when he was employed by Franklin Transportation, "I was accused of spitting on the floor, in which I did not do and I was fired." (R. 191-96).

In the undated Disability Report he submitted to the Agency, the claimant stated that he left his last employment with Johnson Control as a seat builder on 2/1/05 because of "my condition(s)" listed above as "1. Hbp; stroke; headaches; dizziness; depression; 2. memory loss; 3. carpal tunnel," and he acknowledged that he had never seen a doctor or other health professional or received treatment for any mental condition.   He was not yet released to return to work when he shot his wife, resulting in incarceration.

The claimant was incarcerated for five years from 2005-2010.   The record is unclear about the exact date his incarceration began[2], but the ALJ's questioning of him refers to his being in prison five years, and the record reflects that he was released on or about November 28, 2010. (R. 49 & 253 (Correctional Medical Services Discharge/Release Health Information)).   The

_____

[2] At the hearing, the ALJ made the following reference: "I was about to say that the issues are that this 12/7/10 application would have a problem with the onset date of 6/1/05 because of prison." (R. 42).   The ALJ also refers in a question to the claimant about "all five years or so you were in prison." (R. 49).

records reflect that the claimant was in two facilities during these years, in Bullock and Bibb

Counties, but no clarity exists about when he moved from one to another.

According to the claimant's hearing testimony, during two of those five years, he was

assigned to the cleaning crew at the prison doing "a little cleaning and stuff like that," and he

explained that he picked up paper.  The number of hours a day he worked varied, and he thinks

he was paid wages when he worked.  (R. 48).

Because the ALJ found that the claimant was not disabled prior to April 12, 2011 and that

his disability began on April 12, 2011, the court will address the claimant's history in two parts:

prior to April 12, 2011; and from April 12, 2011 onward.

### 2.  Health History & Treatment Prior to April 12, 2011

a. Physical Health

According to both Dr. John R. Goff, PhD, and neurologist Robert MacGregor of MDSI

Physician Services, the claimant's records from DCH Regional Medical Center in 2005 indicate

that the claimant had a "hypertensive crisis and headaches and dizziness [with a diagnosis] of

hypokalemia, hyperlipidemia and sinusitis" as well as a second hospitalization involving

hypertension prior to 2011.  (R. 339 & 440).   The DCH charts that are part of this record show a

hospitalization in February of 2005 for a hypertensive crisis with headaches and dizziness with

blood pressure readings of  220/146 (R. 273 & 294).  DCH charts for the February 2005

hypertensive crisis reflect that he was "noncompliant taking his blood pressure medicine."  (R.

293).

In May of 2005, the claimant was treated at DCH Emergency Room for chest pain and

dizziness with blood pressure readings of 142/67, 151/103, and 174/122. The hospital chart

reflects that his current medications included blood pressure drugs.  No notations reflect non-compliance.  (R. 308 & 312).

Although the claimant apparently entered prison in 2005, the record does not include prison health charts for 2005, 2006, and the first months of 2007.

From March 2007-2010, Dr. Tahir Saddiq treated the claimant for headaches, high blood pressure, and dizziness.  On March 12-13, 2007,  his Intake Health Evaluation showed a blood pressure reading of  220/120 with a re-take of 150/110, and he responded "yes" to questions about severe headaches, dizziness, vision problems.  The chart reflects that the claimant had not taken his blood pressure medication "this evening," but that notation implies that he was taking medication, and had simply not taken the evening dose.  (R. 217 & 223).  On March 15, 2007, Prison Health Services Progress Notes reflect that the claimant had blood pressure of 210/130 and stated that he had a history of uncontrolled blood pressure with a CVA (cerebrovascular accident) in 2005.  The chart stated that the claimant should continue "current meds."   On June 18, 2007, the claimant's blood pressure readings were  145/102 and 204/133, and he complained of headaches.  A few days later on June 22, 2007 his reading was 220/120, and he responded "yes" to questions about severe headaches, dizziness, vision problems.  Although the June 18, 2007 entry indicated that the claimant did not want to stay in the "HCC overnight," the record did not reflect noncompliance with medication in these 2007 incidents.  (R. 222).

On August 22, 2008, the ADOC Health Evaluation reflects that the claimant's blood pressure was 175/112.  The record regarding this 2008 evaluation did not reflect noncompliance with medication.  (R. 226).

In February of 2010, the claimant's blood pressure was 126/81 with a note that he needed

to return to the clinic because his blood pressure was increasing.  A month later, in March, the chart note reflected hypertension, dizziness, and "feeling bad" with a reading of 160/100, and the chart reflected that he would receive medications for blood pressure weekly in the infirmary.   (R. 236-39).  In July his reading was 124/84 and in  September of 2010, his reading was 136/84.  (R. 213-253). His health evaluation on October 13, 2010 reflected a blood pressure reading of 105/79.  (R. 251).   The claimant's November 28, 2010 discharge health information listed several blood pressure medications such as clonidine, lisinopril, triamterene, and hydralazine, and he was discharged with at least a 30 day supply of each.  (R. 253).  None of the 2010 chart entries reflected noncompliance with medications.

On January 22, 2011, approximately two months after the claimant's release from prison, Robert MacGregor, M.D., a neurologist, examined him at the request of the Agency.  During the examination, the claimant reported dizziness and frequent headaches, but also reported that he handled his personal hygiene independently, without assistance.  The claimant described taking several blood pressure medications.  Dr. MacGregor's report did not reflect that the claimant reported depression or any mental problems.  Upon examination, the claimant could walk without complications, get on and off the examination table without problems, and could remove his shoes/socks without difficulty.  The examiner noted that the claimant had a normal cardiac examination, but that his blood pressure was 220/120, and that the claimant had normal sensory responses and was neurologically intact.  Dr. MacGregor provided a diagnosis of "hypertensive urgency" and  advised the claimant to have his blood pressure re-checked and to go to the emergency room if his blood pressure remained elevated.   (R. 338-342).

9

2.  Mental Health

Paul Davis, Ph.D., a psychologist, examined the claimant on February 16, 2011, at the request of the Agency.  During the examination, the claimant reported that he left his job because of elevated blood pressure, and that his doctor did not clear him to return to work.  At the time of the examination, the claimant reported being depressed, but was taking no medications for depression.  The claimant described poor sleep patterns; he was only sleeping 45 minutes per day. Dr. Davis's reports revealed a depressed mood, but no extreme shifts in emotions.  The doctor noted that the claimant's thought content, process, and abstraction were all normal. During the examination, the claimant reported participating independently in activities of daily living, and has no interest in anything but interacting with his family. Dr. Davis gave the claimant a diagnosis of major depression, recurrent but moderate symptoms; opined that the claimant was limited by concentration problems associated with depression, but was able to interact appropriately with supervisors, co-workers, and work pressures.  Dr. Davis noted that the claimant could fully manage his funds.  (R. 343-350).

Robert Estock, M.D., a psychiatrist, performed a psychiatric review of the claimant on March 23, 2011.  (R. 351).  During the examination, the claimant alleged depression and memory loss, and stated that he had an eleventh grade education, and that he had no history of special education classes.  Dr. Estock's review evaluated the claimant for affective disorders under Listing12.04, finding that a medically determinable impairment is present that does not precisely satisfy the 12.04 "disturbance of mood" diagnostic criteria for depressive syndrome, manic syndrome or bipolar syndrome.  Instead, Dr. Estock explained his disorder as "MDD [Major Depressive Disorder], recurrent, moderate."  (R. 354).

10

In rating the claimant's functional limitations, the "B" criteria of the listings, Dr. Estock found only mild limitations in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace with no episodes of decompensation. The evidence did not establish "C" criteria under 12.04 (affective disorders) or 12.06 (anxiety-related disorders). The consultant's notes indicated that the claimant's statements regarding his limitations in activities of daily living were "partly credible," but that the severity alleged was not consistent with medical evidence. (R. 360-63).

In his Mental Residual Functional Capacity Assessment Summary Conclusions, Dr. Estock found no marked limitations and found moderate limitations in the following categories: the ability to understand and remember *detailed* instructions; the ability to carry out *detailed* instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. Dr. Estock found that the claimant had no significant limitations in the following categories: ability to remember locations and work-like procedures; the ability to understand and remember and carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to make simple work-related decisions; the ability to complete a normal workday and workweek without interruptions

from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to ask simple questions or request assistance; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to be aware of normal hazards and take approrpriate precautions; and the ability to travel in unfamiliar places or use public transportation.  (R. 366). The claimant reported issues with concentration, grooming, remembering to complete tasks, and getting along with others.  (R. 365-66).  During the examination, the claimant mentioned that he performed "convenience cooking and light cleaning, shops for groceries in stores, trouble handling money, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others."  (R. 363).

Dr. Estock noted that no problems existed with hygiene, that no unusual behaviors or mannerisms existed, and that the claimant's speech was normal. Dr. Estock did note that the claimant's mood was depressed, but referred to Dr. Davis's findings that the claimant was alert to date, person, place, and situation; and that the claimant had no problems with concentration, memory, and abstract thinking.  Dr. Estock concluded that the claimants' statements about activities of daily living were "partly credible [;] the severity alleged is not consistent with [Dr. Davis's medical examiner report.]" (R. 363).

### April 12, 2011 and afterwards

As the ALJ determined that the claimant was disabled beginningApril 12, 2011, the court will not list in detail his health history after that date except where it is relevant to his condition before April of 2011.

Because the claimant's hypertension existed *before April 12, 2011* and because

12

hypertension is part of what the ALJ based his finding of  disability upon *as of April 12, 2011*, the April 13, 2011 records for treatment of the claimant's hypertension at Whatley Health Services, Inc. may be helpful to determine whether a change occurred between his treatment for hypertension in January of 2011 and the April 13, 2011 treatment.  The April 13, 2011 records reflect that the claimant complained of occasional dizziness, and headaches,  with chronic joint pain.  The doctor recorded the claimant's blood pressure at 217/141, and diagnosed the claimant with severe hypertension and GERD. (R. 370).

In addition, because the listing 12.05C requires a "valid verbal, performance, or full-scale IQ of 60 through 70" as the first element of the listing, the evaluation and IQ testing from psychologist Dr. John  Goff on November 21, 2011, at the request of the Agency, is relevant. During the examination, the claimant exhibited significant problems with his memory and concentration.  Dr. Goff noted that the claimant had low immediate memory scores and that he worked slowly, unable to finish the WRAT-IV testing.  Dr. Goff opined that the claimant was able to understand, remember, and carry out very simple instructions but not complex ones. Noting right-hand weakness and right-hand dexterity deficits, the doctor found that the deficits suggested left cerebral hemisphere dysfunction consistent with a stroke and his "long history of uncontrolled hypertension."  (R. 440-448).

Dr. Goff further noted that the claimant had particular problems with verbal skills.  Dr. Goff recorded the claimant's IQ score at 68; verbal comprehension at 66/1; perceptual reasoning at 79/8; working memory at 77/6; and processing speed at 71/3.  The doctor stated that, in his opinion, the claimant gave a "straightforward performance."  Dr. Goff noted that the verbal comprehension index of 66/1 *and* the full scale IQ score of 68 both fell within the mildly retarded

range; and that the General Ability Index (GAI) was 70, which fell at the edge of the borderline to mildly retarded range.  Dr. Goff stated that the claimant was functionally illiterate.  (R. 442-448).  The math scores ranged "at the mid-fifth grade level so he is able to perform simple mathematical calculations and he is able to deal with mathematics sufficiently to manage his financial affairs probably."  (R. 443).

As a diagnosis, Dr. Goff found that the claimant had a moderate to severe cognitive disorder "probably associated with a CVA," and a moderate to severe reading disorder.  Although the doctor acknowledged that he did not formally assess the claimant's psychiatric issues, the doctor stated  that "the people down at the mental health center" had given the claimant a diagnosis of major depression.  Accordingly, Dr. Goff included in his diagnosis:  "Major Depressive Disorder, Recurrent, with Psychotic Features by History."   Dr. Goff noted that, in combination with the claimant's psychiatric difficulties and cognitive disorder, the claimant had a severe impairment. (R. 445).  Noting the claimant's "long history of uncontrolled hypertension," and referring to his "right-sided weakness and right-sided deficits in dexterity," the doctor stated: "I think quite likely he has had a stroke."  (R. 444-45).

In his Medical Source Statement (Mental), Dr. Goff found extreme deficits in the claimant's ability to understand, remember, and carry out complex instructions and in his ability to understand, remember, and carry out repetitive tasks.  He found marked deficits in the following: constriction of interests; ability to understand, remember, and carry out simple instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; and ability to respond to customary work pressures.   The other deficits

14

were mild to moderate.  Dr. Goff found that these impairments caused limitations that have

lasted or can expect to last for 12 months or longer.   (R. 446-448).

*The ALJ Hearing*

The ALJ held a hearing on August 17, 2012.  (R. 39-64). At the hearing, the claimant's

attorney asked the ALJ to evaluate his client under the listing of § 202.09 based on his functional

illiteracy and history of unskilled work.  He did not mention any other listing as applicable.  The

attorney pointed to the claimant's "chronically uncontrolled hypertension" accompanied by

cognitive loss and psychological problems and argued that the combination of physical and

mental conditions resulted in the claimant's inability to work.  (R. 44).

The claimant testified that he was disabled because of uncontrolled hypertension and

cognitive loss.  The claimant also reported anger management difficulties and difficulty

understanding, remembering, and carrying out instructions.  (R. 56).

The claimant testified that he did not graduate from high school, but that he did complete

the 11th grade, noting that he did not participate in special education or alternative schooling.

The claimant testified that he was divorced and lived with a friend.  The claimant also stated that

he has two children, but that he did not know their ages.  The claimant further stated that he did

not read or write very well.  The claimant also reported that he had worked several jobs as an

assembler. (R. 46-48).

The claimant testified that, while he was incarcerated, he did not have a particular job.

However, he did report that for approximately two of the five years in prison, he was on a

cleaning crew and picked up paper.  The claimant's attorney stated to the ALJ that the client had

been hospitalized twice while in prison because of his blood pressure, listing the hospitalization

dates of August 22, 2008, and March 5, 2010 .  (R.48-49).

The claimant testified that he has memory loss, and that he needs help remembering to take his medications and taking a bath.  The claimant also stated that he becomes dizzy while standing and bending, requiring him to sit down or lie down.  The claimant further testified that his blood pressure stays elevated. The claimant reported having shortness of breath and dizziness while walking from the parking lot into the ALJ hearing and walking to a friend's house down the block.  (R. 49-51).  As far as household chores, he has a difficult time finishing those tasks because such activity caused his blood pressure to rise, and he became dizzy and short of breath. (R. 54 & 57).  The claimant described having two to three bad days a week that require him to sit or lie down, not do anything, and isolate himself from others.   The claimant also testified that he had problems being around others, so he isolates himself.   He described himself as being nervous all the time and testified as well that both hands shake, which makes shaving difficult. (R. 52-55).

At the hearing, the vocational expert, William A. Crunk, testified that, a hypothetical individual with the claimant's age, education, work experience, and condition *before April 12, 2011* with some dementia, and a history of hypertension with some fluctuation, and a history of depression and anger management, could perform work in the national economy.  The hypothetical acknowledged that a question existed about functional literacy in terms of reading but the ALJ noted that "math can be done ... [s]o I would probably be more inclined to go with your limited testimony limitations."  The hypothetical also assumed that the individual could perform light work and would "have to avoid heights, dangerous situations with moving machinery, and anything that would be prohibited by hypertensive episode."  The  vocational

expert testified that such an individual could perform occupations such as a laundry worker, with 4,700 positions available in Alabama and 240,000 nationally; a cleaner, with 6,000 jobs in Alabama and 450,000 nationally; and a hand packer with 2,600 jobs in Alabama and 256, 000 nationally. (R. 58-60).

As a second hypothetical, the ALJ further asked the vocational expert to consider the same information as before–age, education, work experience, and capacities–but included an assumption that the individual

> would be able to understand and remember simple instructions, but would have difficulty with detailed and complex; could carry out short and simple instructions and attend concentration for two hour periods on simple tasks, with customary breaks to rest; could benefit from a flexible schedule, but may miss one to two days a month due to psych-like symptoms. The interaction is contact with the public would be causal; criticism and feedback from supervisors and coworkers in the workplace would be casual and not confrontational. Changes [ ] gradually, and the individual may need assistance in setting realistic [inaudible].

(R. 60-61). The vocational expert responded "No," but because the end of the hypothetical is inaudible, the record does not make clear whether the expert is responding "no" as in no work existed or "no" as in the changes would not preclude work.

As a third hypothetical, the ALJ added to the factors above that the hypertensive issue is more consistently high with difficulty controlling it; hand-shaking; dizziness, and shortness of breath. The expert responded that no jobs would exist under hypothetical three.

As a fourth hypothetical, the ALJ asked whether an individual with the factors listed in the first two hypotheticals but with an increase in depressive symptoms as well as difficulty being around people. Under the fourth hypothetical, according to the expert, the individual would not be able to work. (R. 58-62).

In a fifth hypothetical, the claimant's attorney asked whether if the individual "would likely miss another day on physical conditions on average per month, would this individual be able to sustain substantial gainful activity?"  The VE replied that if the individual would miss at least two or more days per month, he would not be able to work.   (R. 62).

*The ALJ's Decision*

The ALJ issued a partially favorable decision on September 21, 2012.  (R. 20-38).

In support of her findings, the ALJ first noted that the claimant met the insured status requirements of the Social Security Act through December 31, 2010.  Second, the ALJ also noted that the claimant had not engaged in substantial gainful activity since the amended onset date. (R. 26).

Third, the ALJ found that since the amended onset date of disability, November 29, 2010, the claimant had the following severe impairments: hypertension and depression.  (R. 26).  The ALJ also noted that the claimant had a history of alcohol abuse, but no evidence existed of abuse since 2004.  Thus, the ALJ determined that the claimant's alcohol abuse was a non-severe impairment and not material.  (R. 27).

Fourth, the ALJ found that since the amended onset date of disability, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  In supporting her decision, the ALJ specifically considered the listed impairments and criteria under Listings 4.00 (cardiovascular systems), and 12.04 (affective disorders).  The ALJ noted that the evidence showed that the claimant's symptoms did not meet the criteria, as no evidence existed of loss of function or impairment that interfered very seriously with the claimant's ability to independently initiate, sustain, or complete

18

activities.  (R. 27).

Fifth, the ALJ determined that, *prior to April 12, 2011*, the date the claimant became disabled, the claimant had the residual functional capacity to perform light work, as defined by the Social Security Act with the following limitations: no working around heights, dangerous, or moving machinery. In making this determination, the ALJ specifically noted that the assessment of the claimant's RFC allowed for many of his subjective complaints and limitations.  However, the ALJ applied the pain standard to the subjective complaints and found that the claimant's allegations and subjective complaints on some matters, such as the extent of dizziness and shaking of hands and light-headedness that he suffered and their effect on his daily activities, were not fully credible when considered in light of the claimant's own description of his activities set out in reports and hearing testimony.

In considering these alleged symptoms, the ALJ gave the following reasons for finding not fully credible the claimant's allegations that he is unable to perform an significant work activities on a sustained basis: (1) the claimant's "described  daily activities [ ]are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations"; (2) the claimant completed his assigned work detail while incarcerated; (3) the claimant gave differing reasons for not returning to work; and  (4) the claimant testified to two hospitalizations while incarcerated, but the evidence only documents one hospitalization.

As to the described daily activities, the ALJ found that they were not limited to the extent that one would expect, given the complaints of disabling symptoms and limitations.  The ALJ noted that the claimant reported being completely independent in participating in activities of daily living and personal hygiene, except that his hands shook, making shaving difficult.

19

Nevertheless, the ALJ noted that the claimant reported "shopping, watching television, preparing microwaveable foods, cleaning his room, going out of the home two to three times a week, and riding in a car (no driver's license)." (R. 29).

As to the prison job, the ALJ focused on the claimant's report acknowledging, according to the ALJ, that while he was incarcerated, he completed his assigned work details.  As to the inconsistencies in work history, the ALJ pointed to what she characterized as contrary statements, explaining that the claimant described in his Function Report (Exhibit 3E) being fired for spitting on the floor but stated elsewhere that he "described not returning to work due to his hypertension."  (R. 29).   Finally, the ALJ  noted that the claimant testified that he had two admissions while incarcerated, but, according to the ALJ, "the evidence only documents one.  He was hospitalized in 2005, which was well before his incarceration."  (*Id.*).

The ALJ ultimately determined that the claimant's symptoms and subjective complaints were not fully credible, because they were not consistent with the objective medical evidence and other evidence.  (R. 29).

In addition to these subjective complaints, the ALJ addressed the claimant's assertion of severe hypertension that was not adequately controlled by medication.  The ALJ noted the examination by Robert MacGregor, M.D. on January 22, 2011.  During the examination, the claimant reported dizziness and frequent headaches, but upon examination the claimant could walk and move without difficulty.  The ALJ noted that during the examination, the claimant had a normal cardiac examination, normal sensory, and was neurologically intact.  Acknowledging that Dr. MacGregor took a blood pressure reading of 220/120 and "advised [the claimant] to go to the emergency room if his blood pressure remained elevated," the ALJ proceeded to explain

20

that "[o]therwise, claimant had a normal examination."  The ALJ noted that the claimant was seen on April 13, 2011, with "severe hypertension with dizziness, headaches, and pain." Therefore, the ALJ found that, prior to April 12, 2011, the claimant's hypertension was controlled with oral medications, finding that the claimant was able to perform a modified range of light work activity.  (R. 29).

The ALJ also gave great weight to the opinion of Paul Davis, Ph.D.  The ALJ noted that, during the examination at the request of the Agency, the claimant reported that he left his job secondary to elevated blood pressure and that his doctor had not cleared him to return to work. However, the ALJ pointed out again, that the claimant reported on his function report that he was fired for spitting on the floor.  (Exhibit 3E).  The ALJ further noted that the claimant reported to Dr. Davis being depressed, but that he was taking no medications; the claimant also described poor sleeping habits, only sleeping 45 minutes per day.  The ALJ found the claimant's reports inconsistent with the function report, which, according to the ALJ, stated that the claimant had normal sleep behavior, no history of special education services, and had made no allegations of poor reading or writing skills.  (R. 30).

The ALJ found Dr. Davis's diagnosis of major depression, but ability to interact appropriately with supervisors, co-workers, and work pressures, consistent with the overall objective medical evidence.  The ALJ found that as of April 2011, the claimant's symptoms exacerbated to the point of disabling symptoms; thus, the ALJ gave great weight to Dr. Davis's assessments.  (R. 30).

The ALJ also considered the findings and opinion of DDS consultant Robert Estock, M.D.  Dr. Estock determined the claimant's limitations to be mild.  The ALJ determined that

these findings were consistent with the record as a whole.  The ALJ noted that the record was clear that the claimant's symptoms were mild to moderate, up until April 12, 2011.  Under these circumstances, the ALJ gave the opinion of Dr. Estock great weight. (R. 30).

The ALJ ultimately found that, prior to April 12, 2011. the objective medical evidence clearly supported a residual functional capacity for light work except no working around heights, dangerous or moving machinery, etc.; the ALJ concluded that the claimant was not disabled prior to April 12, 2011.  (R. 30).

Sixth, the ALJ found that, in combination with his hypertension reported on April 13, 2011 and depression, the claimant's alleged disability would preclude performance of work in terms of absenteeism and staying on tasks more than 80% of the day.  Thus, the ALJ determined that the claimant's disability began April 12, 2011.  (R. 31).  In reaching this decision, the ALJ found that, beginning April 12, 2011, the claimant's allegations regarding his symptoms and limitations were generally credible. (R. 31).

The ALJ stated that the claimant's objective medical evidence established, beginning on April 12, 2011, that the claimant's symptoms exacerbated to the point of disability.  The ALJ noted that the claimant presented himself to Indian Rivers Mental Health Clinic on April 12, 2011, with significant depressive symptoms.  At the appointment, the doctor noted that even with psychotropic medications, the claimant only had a tiny change in his symptoms; and that the claimant's GAF ranged from 36 to 48, which indicated serious to very serious problems.  (R.31).

In support of the claimant's disability date, the ALJ noted the examination by Dr. John Goff, Ph.D., on November 21, 2011.  During this examination, Dr. Goff indicated significant problems with claimant's memory and concentration secondary to depression.  Dr. Goff noted

that the claimant was functionally illiterate, very depressed, and suffered from marked deficits in his ability to maintain concentration, persistence for extended periods, performing activities within a scheduled time, and ability to respond to customary work pressures. (R. 31).

The ALJ considered the findings and opinions of Dr. Goff to be consistent with the overall objective medical evidence.  The ALJ noted that the record clearly showed that beginning in April 2011, the claimant had marked to extreme limitations associated to his depression and cognitive disorder.  The ALJ concluded that the findings were supported by the mental health treatment notes and Dr. Goff's mental status examination.  Therefore, the ALJ gave great weight to Dr. Goff's assessments.  (R. 31).

Seventh, the ALJ found that since November 29, 2010, the claimant was unable to perform any past relevant work.  The ALJ noted that the demands of the claimant's past relevant work exceeded the residual functional capacity.  (R. 32).

Eighth, the ALJ found that prior to April 12, 2011, considering the claimant's age, education, work experience, and residual functional capacity, jobs existed in significant numbers in the national economy that the hypothetical person could perform.  Based on the vocational expert's testimony, the ALJ determined that a finding of "not disabled" was appropriate, prior to April 12, 2011.  (R. 32-33).

The ALJ further found that beginning on April 12, 2011, considering the claimant's age, education, work experience, and residual functional capacity, no jobs existed in significant numbers in the national economy that the hypothetical person could perform. Based on the vocational expert's testimony, the ALJ concluded that a finding of "disabled" was appropriate under the framework of the Medical-Vocational Guidelines, as of April 12, 2011.  (R. 33).

Lastly, the ALJ determined that the claimant was not disabled prior to April 12, 2011, but became disabled on that date, and continued to be disabled through the date of the ALJ's decision.  The ALJ noted that the claimant was not under a disability within the meaning of the Social Security Act at any time through December 31, 2010, the date last insured; setting the date of disability four months after the last insured date meant that the claimant was ineligible for disability insurance benefits.  (R. 33).

*Appeals Council*

On November 21, 2012, the claimant's counsel hand delivered a letter to the Appeals Council appealing the ALJ's decision, and asserting that substantial evidence did not support it. (R. 16-18).

In a Notice of Appeal Council Action dated July 17, 2014, the Appeals Council denied the claimant's request for review.  (R. 1-4).

## VI. DISCUSSION

The claimant argues that the ALJ failed to properly consider listing 12.05C (Mental retardation) of the regulations; and that substantial evidence fails to support the ALJ's RFC finding[3].

### A.  12.05C Listing

The claimant argues that his impairments met subsection C of Listing 12.05, and that the ALJ failed to properly consider the listing. The Commissioner argues that the claimant failed to

---

[3] Although the claimant's brief did not have a separate section challenging the ALJ's RFC finding, the claimant's brief discussed the RFC findings and pointed out alleged errors in them. The Commissioner's brief acknowledged the challenge to the RFC findings and addressed that challenge.

24

notify the ALJ that he should apply listing 12.05C, and, alternatively, that the claimant does not meet that listing.

At the time of the ALJ's decision on September 21, 2012, Listing 12.05C stated[4]:

*Mental retardation:* Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
***
C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. pt. 404, subpt P, app 1, § 12.05 (2012).  To be considered for disability benefits under section 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) *have manifested deficits in adaptive behavior before age 22*."  *Crayton v. Callahan,* 120 F.3d 1217, 1219 (11th Cir. 1997) (emphasis added).

Although the claimant now asserts that the ALJ failed to consider Listing 12.05C, the claimant did not allege mental retardation in his disability application, and the only Listing that the claimant's attorney mentioned at the hearing was Listing 12.02.  Neither the claimant nor his attorney referred to the claimant's IQ score in the application or at the hearing, and did not otherwise notify the ALJ that they were alleging disability pursuant to mental retardation or intellectual disability.  Further, in the claimant's hearing testimony, he stated that he did not

_____

[4] On August 1, 2013, the SSA changed the terminology in Listing 12.04 from "mental retardation" to "intellectual disability."   78 Fed. Reg. 46, 499-01 (Aug. 1, 2013); *see Hickel v. Comm'r of Soc. Sec.,* 539 F. App'x 980, 982 n.2 (11th Cir. 2013) (acknowledging change).

participate in special education or alternative schooling; that testimony would be relevant to the 12.05C requirement that the intellectual deficits manifested before age 22.

When the claimant fails to bring the ALJ's attention to a specific listing, the ALJ has no obligation to specifically discuss whether the claimant's impairments meet or equal a specific listing. *Robinson v. Astrue*, 365 F. App'x 993, 995 (11th Cir. 2010). Furthermore, the  ALJ need not search the record for other impairments that might be disabling that have not been identified by the claimant. *Street v. Barnhart*, 133 F. App'x 621, 627 (11th Cir. 2005).   The ALJ is under no obligation to investigate a claim not presented at the time of the application for benefits, and not offered at the hearing as a basis for disability. *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996).

Applying this law to the instant case, the court FINDS that, under these circumstances, the ALJ did not err in failing to consider Listing 12.05C when evaluating the claimant.   Neither the disability application nor arguments and testimony at the hearing placed the ALJ on notice that Listing 12.05C should be considered.  Without such notice, the ALJ had no obligation to search the record for a 12.05C impairment.[5]

### B.  RFC Prior to April 12, 2011

The claimant also challenges the ALJ's findings that the claimant's conditions

---

[5] The court notes that the claimant's low IQ scores would not necessarily mean that 12.05C applied to the claimant.   Section 12.05's introductory paragraph, which the claimant's brief ignores, requires, among other things, that the intellectual deficit manifest itself before age 22.  Evidence in the record submitted to the ALJ, such the claimant's lack of special education classes when he was in school and Dr. Goff's evaluation that the claimant's cognitive disorder was "probably associated with a CVA" (R. 444-45), would be consistent with onset of the impairment *after* the developmental period and would not be consistent with the applicability of 12.05C.

represented mild to moderate limitations on work or activities of daily living prior to April 12, 2011.  The claimant asserts instead that his hypertension was severe long before that date, and that his severe hypertension combined with his symptoms and cognitive loss resulted in disability prior to April 12, 2011, and, presumably, prior to his last insured date of December 31, 2010.

This court does indeed find perplexing the ALJ's determination that, before April of 2011, the record fails to document any major problems with hypertension as long as the claimant was taking appropriate medication.  The court recognizes that the February 2005 hypertensive crisis occurred when the claimant was noncompliant with blood pressure medication.  However, the ALJ's characterization of the claimant's blood pressure condition between March 2005 and April 2011 as responsive to oral medications with an absence of major problems is not accurate.

Contrary to the ALJ's finding, the medical charts in the record after February of 2005 show repeated incidents of high blood pressure with no indication that the claimant was noncompliant with medications: May 2005–readings of 142/67, 151/103, 174/122 (accompanied by dizziness); March 13, 2007–220/120 (accompanied by headaches, dizziness, and vision problems); March 15, 2007–210/130; June 18, 2007–145/102 & 204/133 (accompanied by headaches; notation to continue *current* meds); June 22, 2007–220/120 (accompanied by severe headaches, dizziness, and vision problems)**;** August 22, 2008– 175/112; [the record reflects no blood pressure readings, normal or abnormal, for 2009]; February 2010–126/81; March 2010 of 160/100 (accompanied by dizziness and "feeling bad"**);** July of 2010–124/84; September of 2010– 136/84; January 22, 2011–220/120.  Despite these readings, *five of which reflect a systolic blood pressure reading over 200*, the ALJ "find[s] that prior to April 12, 2011 his hypertension was controlled with oral medications." (R. 29).

27

The court can find no meaningful distinction between many of these pre-April 12, 2011 incidents, with 200 plus systolic readings accompanied with headache and/or dizziness, and the April 13, 2011 reading of 217/141 with dizziness and headaches.  Further, the ALJ's characterization of the claimant's pre-April 12, 2011 hypertension as "controlled" runs counter not only to the high readings but also to the notations in the charts indicating that the claimant was asked to stay in the clinic for monitoring (R. 222), and that, at one point, he was told to return to the infirmary weekly.  (R. 236).

Finally, the ALJ's finding that the claimant's hypertension was controlled before April of 2011 is contrary to Dr. MacGregor's treatment notes in January of 2011, shortly after the last insured date.  Dr. MacGregor's diagnosis of  "hypertensive urgency" with a direction that the claimant should go to the emergency room if his blood pressure remained at the elevated level is not compatible with the ALJ's characterization of the claimant's condition as "controlled." (R. 342).  The ALJ's statement that the doctor advised the claimant to go to the emergency room if his blood pressure remain high *but "[o]therwise, claimant had a normal examination*," is another example of the ALJ's trivializing the claimant's serious health issues; in phrasing akin to the proverbial "other than THAT, Mrs. Lincoln, how was the play?" the ALJ ignores Dr. MacGregor's serious diagnosis of "hypertensive urgency."  In short, the ALJ's opinion ignores and trivializes the evidence of  claimant's serious hypertensive problems existing before the last insured date; substantial evidence does not support the ALJ's opinion to the extent that the ALJ finds that a meaningful change occurred in the claimant's hypertensive condition from April 12, 2011 onward.

In addition, the court finds that substantial evidence does not support the ALJ's pain

28

standard analysis discrediting many of the claimant's subjective complaints and supporting the

ALJ's RFC.  In evaluating pain and other subjective complaints, the Commissioner must

consider whether the claimant demonstrated an underlying medical condition, and *either* (1)

objective medical evidence that confirms the severity of the alleged pain arising from that

condition, *or* (2) that the objectively determined medical condition is of such a severity that it can

reasonably be expected to give rise to the alleged pain.  *Holt v. Sullivan*, 921 F.2d 1221, 1223

(11th Cir. 1991).  If the ALJ decides to discredit the claimant's testimony as to his [subjective

complaints], she must articulate explicit and adequate reasons for that decision; failure to

articulate reasons for discrediting claimant's testimony requires that the court accept the

testimony as true.  *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995).

Here, the court finds that the articulated reasons for discrediting the claimant's testimony

are not adequate.  The ALJ noted the claimant's subjective allegations, such as that he was "dizzy

with standing and bending [and] walking to a friend's house down the block," that "walking from

the parking lot he had shortness of breath and dizziness," that he had "two to three bad days a

week that requires him to lie down," and "that his hands shake, which makes it difficult to

shave."  (R. 28-29).   In considering these alleged symptoms, the ALJ gave the following

reasons[6] for finding not fully credible the claimant's allegations that he is unable to perform an

---

[6] The court notes that the ALJ also stated in the section of her opinion discussing the claimant's mental status that the claimant's description of sleep problems to Dr. Davis (45 minutes per day (R. 345)) was contrary to "his own function report [where h]e reported normal sleep behavior." (R. 30).  However, the ALJ's statement is not accurate.  In the Function Report, the claimant reported that his normal routine was going to sleep at 2-3 AM and waking at about 5 AM.  (R. 191).  Although 2-3 hours of sleep is more than the 45 minutes of sleep that the claimant reported to Dr. Davis, that amount of sleep is not "normal sleep behavior" and is consistent with sleep problems.

significant work activities on a sustained basis: (1) the claimant's "described  daily activities ...

are not limited to the extent one would expect, given the complaints of disabling symptoms and

limitations"; (2) the claimant completed his assigned work detail while incarcerated; (3) the

claimant gave differing reasons for not returning to work; and  (4) the claimant testified to two

hospitalizations while incarcerated, but the evidence only documents one hospitalization in 2005,

before his incarceration.  (R. 29).

The daily activities that the claimant described in his function report were watching tv;

dressing himself, but routinely using a seat during the dressing process; bathing and grooming

himself, but using a shower chair to avoid falling and having difficulty shaving because of

shaking hands; preparing easy dinners such as tv dinners and other microwave-able meals, cold

cuts, and finger foods; making his own bed and cleaning his room but doing the process slowly

in a one-to-two-hour period; shopping for food twice a month but he does not reflect that he

shops independently; and riding in a car two or three times per week with someone else driving.

(R. 192-98).

In his hearing testimony, the claimant testified: "[w]hen I try to do little things around the

house, you know, it runs my blood pressure up.  I be about to pass out.  I have shortness of

breath."  (R. 49).  He further testified that he became dizzy when he goes from sitting to standing,

when he remains standing for a short period of time, when he bends over, and when he walks

short distances, such as from the parking lot to the hearing room or to a friend's house down the

street.  He explained that he had two to three bad days a week when he lies and/or sits down and

isolates himself from other people.  As to doing chores around the house, such as cleaning his

room, his chores take two hours or longer because he becomes sick and dizzy.  As he stated in his

function report, both hands shake when he attempts to shave.  (R. 52, 54-58).

Contrary to the ALJ's opinion, this information reflects that the claimant's daily activities are very limited, and those activities are not inconsistent with complaints of disabling symptoms and limitations.

As to the ALJ's reference to the claimant's completing job assignments when incarcerated, the claimant's testimony was that he worked about two of the five years when incarcerated "doing a little cleaning and stuff like that, but other than that, I didn't do [a job]." The claimant explained that by cleaning, he meant that he picked up paper.  (R. 48-49).  The court notes that the prison records do not reflect when the claimant worked, but the health charts of prison doctor Dr. Tahir Saddiq indicated that he treated the claimant for hypertension, headaches, high blood pressure, and dizziness beginning in 2007.  Because the claimant apparently went to prison sometime in 2005, the prison charts reflecting treatment for hypertension and dizziness beginning in 2007 would be consistent with the claimant's assertion that hypertension and dizziness prevent him from working, that the prison health system appeared to acknowledge these health problems as of 2007,  and that the prison system only required him to work about two years out of the five that he was incarcerated.  In any event, the claimant's testimony about the nature and extent of his prison work through his discharge from prison in December of 2010, particularly his statement that the prison did not make him work three of the five years he was incarcerated, is *not* inconsistent with the claimant's allegations of disability prior to December 31, 2010.

As to the ALJ's opinion that the claimant is not credible because he gave conflicting statements about why he left his job, the ALJ mischaracterizes the claimant's statements to

31

establish inconsistency where none exists.  The ALJ points to the claimant's statement in his

Function Report, which says, in response to a question whether he had *ever* been fired, that he

was fired from *Franklin Transportation* for allegedly spitting on the floor.  (R. 196).  In the

Disability Report the claimant submitted to the Agency, he stated that in February of 2005, he

left his last employment with *Johnson Control* because of his conditions of "1.  Hbp; stroke;

headaches; dizziness; depression; 2. memory loss, 3. carpal tunnel." (R. 185).   The ALJ

incorrectly conflated two different work situations into one, when the claimant clearly identified

two *different* employers in the reports, and different reason(s) for leaving each.  The reports were

not inconsistent, but the ALJ mistakenly characterized them to be so, and twice mentioned this

"inconsistency" in the section of her opinion discussing the claimant's RFC for the period prior

to April 12, 2011.  The ALJ's own error cannot form an appropriate basis for a pain standard

credibility attack.

The ALJ's final reason for challenging the claimant's credibility is that the claimant

testified to having two hospital admission while incarcerated when the record only documents

one hospitalization before incarceration.  The court first notes that the *claimant* did not testify to

two hospital admissions while incarcerated: the claimant's attorney made a statement at the

hearing that the claimant had been hospitalized on August 22, 2008 and on March 5, 2010, both

dates occurring during the period he was in prison.  (R. 50).   While the record reflects high

blood pressure readings on those days, it does not reflect hospital admissions on either of those

days.   The court notes that the record contains many holes in the claimant's health history,

particularly in the prison health records.  In any case, the fact that *the claimant's attorney* may

have mis-spoken does not provide support for the ALJ's finding that *the claimant himself* is not

32

credible.

In sum, the reasons that the ALJ gave for finding that the claimant's statements about the intensity, persisting and limiting effects of his subjective complaints were not credible fail to support that finding; the ALJ's application of the pain standard was improper, and substantial evidence does not support her finding that the claimant's subjective testimony regarding dizziness, hand-shaking, and other subjective effects of hypertension is not credible.

The court returns to the third hypothetical, which asked the VE to assume, among other things, that the hypothetical person's "hypertensive issue is such that it is a more consistent high reading; that there is difficulty controlling it, and that it causes some hand shaking, some dizziness, some shortness of breath.  Would there be jobs?" (R. 61).   The expert responded that no jobs would exist under this hypothetical.  In light of this court's findings, added to this hypothetical, the court FINDS that substantial evidence does not support the ALJ's opinion.

## VII. CONCLUSION

For the reasons stated above, the court FINDS that the ALJ's determination regarding the claimant's condition prior to April 12, 2011 is not supported by substantial evidence on the record as a whole.  Accordingly, this case is due to be is REVERSED and REMANDED to the Commissioner for further action consistent with this opinion.

Dated this 2nd day of March, 2016.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE